REVISED July 17, 2008

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 14, 2008

Charles R. Fulbruge III
Clerk

No. 06-60023

North Texas Speciality Physicians,

Petitioner,

v.

Federal Trade Commission,

Respondent.

_____

American Medical Association; Texas Medical Association,

Amicus Curiae.

_____

Petition for Review of a Final Order
of the United States Federal Trade Commission

_____

Before KING, WIENER, and OWEN, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

North Texas Specialty Physicians (NTSP) petitions for review of an opinion and order of the Federal Trade Commission (FTC or Commission) that found certain activities of NTSP constituted horizontal price-fixing unrelated to

any procompetitive efficiencies,[1] in violation of section 5 of the Federal Trade Commission Act.[2] We conclude that the FTC's examination, although somewhat abbreviated, of the factual underpinnings of the conduct at issue, its anticompetitive effect, and the procompetitive effects that NTSP claims have occurred or will occur, was adequate, and the FTC's determinations are supported by substantial evidence. However, the remedial order entered by the FTC is overly broad in one respect, and we accordingly grant the petition for review and remand to the Commission so that it may modify its order.

I

NTSP is an organization of independent physicians and physician groups principally located in Tarrant County, which includes the city of Fort Worth, although physicians from seven other Texas counties are affiliated with NTSP. NTSP's size has varied. It had approximately 575 members in 2003 and 480 members in April 2004. As of 2003, NTSP was comprised of practitioners in 26 medical specialties but also included some primary care physicians. The ALJ found, and NTSP does not dispute, that in Tarrant County NTSP specialists were a large percentage of the practitioners within a specialty, for example 80 percent in pulmonary disease, 59 percent in cardiovascular disease, and 69 percent in urology. Many NTSP physicians compete with one another. All physicians pay a fee upon joining NTSP and elect representatives from their ranks to serve on its eight-member Board of Directors.

---

[1] See N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf.

[2] 15 U.S.C. § 45.

When it formed in 1995, NTSP's original business model was to assemble physician groups and negotiate contracts between these groups and "payors," such as insurance companies, health maintenance organizations (HMOs), preferred provider organizations (PPOs), and partially or fully self-insured employers. These contracts were on a flat fee-per-patient basis and were termed "risk" contracts (also known as "capitation" contracts) because the physician groups bore the risk of profit and loss, based on how efficiently they could provide medical care for the fixed fee per patient during the term of a contract. However, payors' interest in risk contracts declined, and by 2001, NTSP's board began to focus on assisting physicians in negotiating "non-risk" contracts. A non-risk contract is a fee-for-service arrangement between the payor and the physician. The non-risk model was more successful, and at the time of the proceedings before the FTC, NTSP had approximately twenty non-risk contracts and only one risk contract. The FTC found that about one-half of NTSP's physicians participate in the risk contract. Only NTSP's activities with regard to non-risk contracts are at issue. The FTC has not challenged any of NTSP's conduct with regard to risk contracts.

In facilitating non-risk contracts, NTSP and each of its physicians executed Physician Participation Agreements. Those provide that if NTSP enters into an agreement with a payor to disseminate non-risk offers, NTSP will send or "messenger" all of those offers to physicians, who are free to accept or reject them. If more than 50% of the NTSP physicians agree to accept a non-risk offer, NTSP will proceed to negotiate a contract for the physicians. The Physician Participation Agreements contemplate that physicians will not individually pursue a payor offer unless and until they are notified by NTSP that it has permanently discontinued negotiations with that payor. However, the

physicians' relationship with NTSP is not exclusive. If NTSP is not negotiating with a payor or if NTSP has an agreement with a payor that does not cover particular services that a physician seeks to provide, a physician may deal directly with that payor or indirectly through participation in other independent physician associations.

NTSP polls its physicians on an annual basis, asking the minimum rate each would accept in a non-risk contract. NTSP uses the poll responses to calculate the mean, median, and mode of the minimum acceptable fees identified by its physicians. Based on these calculations, NTSP determines a minimum contract fee that it utilizes when negotiating managed care contracts on behalf of its participants.[3] NTSP contends that the poll assists it in determining whether a non-risk offer is likely to attract a majority of its participating physicians, and accordingly, it only messengers non-risk contracts that offer at least the minimum fee calculated from the polls.

NTSP reports the mean, median, and mode from the polls to its participating physicians and explains to participating physicians that "NTSP polls its affiliates and membership to establish Contracted Minimums." In conducting the poll each year, NTSP reminds physicians of the results of the previous year's poll.

The FTC issued an administrative complaint alleging that NTSP restrained competition among its physicians through horizontal price-fixing in violation of the FTC Act.[4] NTSP responded that there were "spillover" effects

---

[3] See 2005-2 Trade Cas. (CCH) at 103,460, slip op. at 4.

[4] 15 U.S.C. § 45(a) (declaring illegal, and giving the FTC the power to prevent, "unfair methods of competition").

from its and its physicians' experience with risk contracts into its non-risk contracts that resulted in net procompetitive effects. It argued that it trains physicians to work together as more efficient teams and to be more efficient as individual practitioners and that these improvements will "spillover" to non-risk treatment if the same teams of key physicians can continue working together. NTSP cites as an example situations in which a primary-care physician and a specialist have coordinated in treating a certain illness, so that other patients with the same condition benefit and receive higher-quality care. It also asserts that its physicians can, through experience, eliminate unnecessary tests and procedures, lowering the cost of health care.

The matter was tried before an Administrative Law Judge (ALJ), who found that NTSP's conduct constituted horizontal price-fixing unrelated to any procompetitive justifications and issued a cease and desist order. NTSP appealed to the FTC for a de novo review, and the Commission affirmed.

The Commission concluded that NTSP's conduct constituted concerted action among physicians because it is controlled by physicians, rejecting the argument that NTSP was a sole actor. The FTC concluded that the participating physicians have taken collective action in an attempt to obtain higher fees.[5] Although the FTC concluded that NTSP's "conduct could be characterized as per se unlawful under the antitrust laws, and thus subject to summary condemnation,"[6] the Commission used an "inherently suspect" analysis, citing

---

[5] 2005-2 Trade Cas. (CCH) at 103,466, slip op. at 16.

[6] Id. at 103,460, slip op. at 3.

its prior decision in Polygram Holding, Inc.,[7] and the District of Columbia Circuit's decision affirming the FTC in that case.[8] The FTC rejected NTSP's proffered pro-competitive justifications and entered a cease and desist order against NTSP that, among other provisions, required termination of existing non-risk contracts at the payor's request or at the earliest termination or renewal date. NTSP now petitions this court for review of the FTC's opinion and order.

## II

NTSP has raised five broad issues on appeal: whether (1) there was concerted action; (2) the FTC could utilize an "inherently suspect" analysis rather than a full-blown rule-of-reason examination and if so, did the Commission ignore undisputed evidence of NTSP's procompetitive justifications; (3) NTSP's right to due process was violated by the denial of discovery regarding procompetitive effects of its conduct; (4) the FTC had jurisdiction; and (5) the FTC's remedial order is overly broad. The FTC's findings "as to the facts, if supported by evidence, shall be conclusive,"[9] even if "suggested alternative conclusions may be equally or even more reasonable and persuasive."[10] We review the FTC's legal analysis and conclusions de novo, "although even in considering such issues the courts are to give some deference to the [FTC]'s

---

[7] 5 Trade Reg. Rep. (CCH) ¶ 15,453 (F.T.C. 2003), available at http://ftc.gov/os/2003/07/polygramopinion.pdf.

[8] Polygram Holding, Inc. v. FTC, 416 F.3d 29 (D.C. Cir. 2005).

[9] 15 U.S.C. § 45(c).

[10] Colonial Stores, Inc. v. FTC, 450 F.2d 733, 739 (5th Cir. 1971).

informed judgment that a particular commercial practice is to be condemned as 'unfair.'"[11] Constitutional challenges are reviewed de novo.[12]

### III

We first consider the jurisdictional issue. NTSP contends that its alleged anticompetitive conduct was not "in or affecting commerce,"[13] because effects on interstate commerce must be "more than de minimis when considered in proportion to the parties' business as a whole," and its conduct "was never shown to have even a de minimis effect on the business of any payor as a whole."

The FTC assumed in the present case that "the definition of 'unfair methods of competition' under the FTC Act, 15 U.S.C. § 45, is the same as the definition of a 'contract combination . . . or conspiracy, in restraint of trade . . . .' under Section 1 of the Sherman Act, 15 U.S.C. § 1,"[14] and at least one circuit court agrees that "the analysis under § 5 of the FTC Act is the same . . . as it would be under § 1 of the Sherman Act."[15] NTSP does not take issue with this interpretation.

The United States Supreme Court has explained with regard to jurisdiction under the Sherman Act that "because the essence of any violation

---

[11] FTC v. Ind. Fed'n of Dentists, 476 U.S. 447, 454 (1986).

[12] See Soadjede v. Ashcroft, 324 F.3d 830, 831 (5th Cir. 2003).

[13] 15 U.S.C. § 45 (declaring unlawful "unfair methods of competition in or affecting commerce" and providing "[t]he Commission is hereby empowered and directed to prevent persons . . . or corporations . . . from using unfair methods of competition in or affecting commerce"); see also id. § 44 (defining "commerce" to include "commerce among the several States").

[14] N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032, at 103,463 n.10, slip op. at 9 n.10 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf.

[15] Polygram Holding, Inc. v. FTC, 416 F.3d 29, 32 (D.C. Cir. 2005).

of § 1 is the illegal agreement itself—rather than the overt acts performed in furtherance of it, proper analysis focuses, not upon actual consequences, but rather upon the potential harm that would ensue if the conspiracy were successful."[16]  The Supreme Court elaborated:

> "If establishing jurisdiction required a showing that the unlawful conduct itself had an effect on interstate commerce, jurisdiction would be defeated by a demonstration that the alleged restraint failed to have its intended anticompetitive effect.  This is not the rule of our cases.  A violation may still be found in such circumstances because in a civil action under the Sherman Act, liability may be established by proof of either an unlawful purpose or an anticompetitive effect.
>
> Thus, respondent need not allege, or prove, an actual effect on interstate commerce to support federal jurisdiction."[17]

The Supreme Court has also explained:  "Nor is jurisdiction defeated in a case relying on anticompetitive effects by plaintiff's failure to quantify the adverse impact of defendant's conduct."[18]  Similarly, the Court has said: "Nor was it necessary for petitioners to prove that the fee schedule raised fees.  Petitioners clearly proved that the fee schedule fixed fees and thus 'deprive[d] purchasers or consumers of the advantages which they derive from . . . competition.'"[19]

The FTC reasoned that "NTSP's actions to maintain physician fee levels, if successful, could be expected to affect the flow of interstate payments from out-

---

[16] Summit Health, Ltd. v. Pinhas, 500 U.S. 322, 330 (1991) (internal citations omitted).

[17] Id. at 331 (quoting McLain v. Real Estate Bd. of New Orleans, Inc., 444 U.S. 232, 242-43 (1980) (internal citations omitted)).

[18] McLain, 444 U.S. at 243.

[19] Goldfarb v. Va. State Bar, 421 U.S. 773, 785 (1975) (quoting Apex Hosiery Co. v. Leader, 310 U.S. 469, 501 (1940)).

of-state payors to NTSP physicians."[20]  Payors also testified that they provide health-care coverage to national companies with employees in Texas, and that an increase in costs for health-care services in Fort Worth would affect the overall insurance costs of these national companies.  If NTSP's efforts to maintain physicians' fees were successful, "as a matter of practical economics,"[21] the advantages of competition have been adversely affected for out-of-state employers and payors.  The FTC had jurisdiction.

IV

The FTC found that "NTSP is controlled by competing physicians, and therefore is not a sole actor for purposes of the antitrust laws."[22]  The Commission "agree[d] with the ALJ's conclusion that NTSP's participating physicians have taken collective action to obtain higher fees from payors."[23]

NTSP maintains that there was no collusion among affiliated physicians and that there was no concerted action.  It advances a number of arguments in this regard.  In analyzing them, we first note that NTSP has compartmentalized the FTC's findings and holdings.  For example, NTSP argues that the FTC held that "a vote taken by a single entity's board of directors not to participate in a payor's offer to physicians satisfies the Sherman Act's conspiracy element."  But the FTC's conclusion that there was horizontal price-fixing did not depend on the isolated fact that NTSP's board refused to messenger all offers from a payor to

---

[20] N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032, at 103,462, slip op. at 8 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf.

[21] Summit Health, Ltd., 500 U.S. at 331.

[22] 2005-2 Trade Cas. (CCH) at 103,466, slip op. at 16.

[23] Id.

affiliated physicians. The FTC concluded, as we will discuss more fully below, that certain aspects of NTSP's non-risk contract business, when considered on the whole, combined to result in horizontal price-fixing. These practices included the disclosure to all affiliated physicians of the median, mean, and mode results of polls to determine the minimum rates physicians would accept, the "reminder" to physicians of those results when subsequent polls were taken for the purpose of establishing a minimum price, and NTSP's use of that minimum price when it negotiated with payors on behalf of physicians.

NTSP maintains that it is a single entity and that it has a right to refuse to deal with payors without violating the antitrust laws, citing the Supreme Court's decision in United States v. Colgate & Co.[24] NTSP contends that it is a "memberless, non-profit corporation" and that its actions are not the actions of individual physicians.

The FTC correctly discerned that antitrust liability does not depend upon a particular form or business structure. As the FTC pointed out, antitrust law would be easily evaded if illegal joint activity could be transformed into legal unilateral activity through the formation of a single trust or other corporate entity.[25] NTSP's status as a "memberless" organization under state law or as an incorporated legal entity does not foreclose a finding of concerted action by the physicians who constitute, use, and control NTSP. In St. Bernard General Hospital, Inc., we held that a plaintiff stated a claim under § 1 of the Sherman Act by alleging that an insurance provider was an association composed of nine hospitals that effectively controlled the board by choosing a majority of the

---

[24] 250 U.S. 300 (1919).

[25] See 2005-2 Trade Cas. (CCH) at 103,466, slip op. at 15.

directors and selecting the "outside" directors.[26]  Here, the affiliated physicians control NTSP in a similar manner through their election of board members and additionally, through their responses to the polls regarding fees.  When an organization is controlled by a group of competitors, it is considered to be a conspiracy of its members.[27]

NTSP counters that the physicians on its board are from different medical specialties and do not compete with one another.  As the Ninth Circuit observed in Hahn, the correct analysis is not whether the board members compete directly with one another but whether the organization is controlled by members with substantially similar economic interests.[28]  Each member of NTSP's board competes with rank-and-file members of the same specialty, and within the rank-and-file, NTSP specialists compete with other practitioners in their specialty, and primary care providers compete with other primary care providers.

NTSP stresses that the ALJ found that no physician agreed with another to reject a non-risk contract offer, there was no consultation among physicians in responding to polls, and no physician knew how another physician would respond to a non-risk offer.  NTSP also emphasizes that no physician agreed in advance to accept contract offers that it negotiated, each physician decided whether to accept a payor's offer, and physicians rejected offers messengered through NTSP more than two-thirds of the time.  The ALJ and the FTC

---

[26] St. Bernard Gen. Hosp. v. Hosp. Serv. Ass'n of New Orleans, Inc., 712 F.2d 978, 981, 985 (5th Cir. 1983).

[27] See United States v. Sealy, Inc., 388 U.S. 350, 352-54 (1967).

[28] Hahn v. Or. Physicians' Serv., 868 F.2d 1022, 1029 (9th Cir. 1988).

concluded that in spite of these facts, the physicians had taken collective action in an attempt to obtain higher fees from payors.[29]  The FTC reasoned that NTSP's arguments "conflate[] what really are two separate issues," those being "whether parties can enter into an agreement absent direct communication with each other,"[30] and "whether it is possible to find that there was an agreement on price even though individual physicians were not bound to adhere to contract terms negotiated by NTSP."[31]

With regard to the first issue, the FTC reasoned that "it is enough that participating physicians individually authorized NTSP to take certain actions on their behalf, knowing that others were doing the same thing,"[32] noting in particular that "NTSP would inform physicians who had not yet granted it contract negotiation authority but were considering it, the number of other member physicians who had already given NTSP that authority."[33]  The record supports this conclusion.  Additionally, as discussed above, the physicians granted NTSP the right to negotiate with payors and agreed not to deal with a payor until NTSP advised that negotiations had ended.  The physicians knew that other physicians were doing likewise and that negotiations by NTSP were for the physicians' collective benefit on price and other material terms.

---

[29] 2005-2 Trade Cas. (CCH) at 103,466, slip op. at 16.

[30] Id.

[31] Id. at 103,467, slip op. at 17.

[32] Id.

[33] Id. at 103,467 n.27, slip op. at 17 n.27.

We agree with the Commission that the fact that physicians could reject offers negotiated by NTSP does not establish that there was no agreement on price. We will consider the price-fixing issue in more detail below.

NTSP asserts that a trade or professional organization cannot be presumed to violate Section 1 of the Sherman Act, citing this court's decision in Viazis v. American Association of Orthodontists.[34] It contends that the FTC deemed NTSP a "walking conspiracy." However, the FTC's opinion explicitly recognized that a trade association is not necessarily "a 'walking conspiracy,'" citing Viazis, and that collective action by competitors must result in an unreasonable restraint of trade before there is an antitrust violation.[35]

NTSP cites this court's decision in Consolidated Metal Products, Inc. v. American Petroleum Institute,[36] arguing that because its physicians remained free to reject an offer messengered by NTSP, NTSP's board is acting unilaterally when it contracts with a payor. In Consolidated Metal Products, a trade association that set standards for oil field equipment delayed in certifying that the plaintiff's sucker rods met its standards. Sucker rods could be and were sold without the trade association's seal of certification. This court held that "a trade association that evaluates products and issues opinions, without constraining others to follow its recommendations, does not per se violate section 1 when, for

---

[34] 314 F.3d 758, 764 (5th Cir. 2002) ("Despite the fact that 'a trade association by its nature involves collective action by competitors, it is not by its nature a walking conspiracy, its every denial of some benefit amounting to an unreasonable restraint of trade.'") (quoting Consol. Metal Prods., Inc. v. Am. Petroleum Inst., 846 F.2d 284, 293-94 (5th Cir. 1988)).

[35] 2005-2 Trade Cas. (CCH) at 103,466, slip op. at 16.

[36] 846 F.2d 284 (5th Cir. 1988).

whatever reason, it fails to evaluate a product favorably to the manufacturer."[37] In conducting a rule-of-reason analysis of the association's actions, this court emphasized that the plaintiff "no longer contends that there was an anticompetitive conspiracy between its competitors and [the trade association],"[38] "[i]t is axiomatic that trade standards must exclude some things as substandard and it is unsurprising that standard-setting bodies sometimes err," and the plaintiff "offers no evidence that [the trade association's] product approval program is merely a ploy to obscure a conspiracy against competing producers." The record of NTSP's and its affiliated physicians' activities in this case does not resemble the conduct at issue in Consolidated Metal Products.

At numerous points in its briefing, NTSP invokes the Supreme Court's decision in United States v. Colgate & Co.,[39] contending that as a single entity, it is entitled to refuse to deal with any payor that it chooses and that it could select a minimum price as the starting point in all negotiations with payors. We have recognized that "[n]othing in the antitrust laws prohibits an individual trader, absent an anticompetitive intent, from announcing in advance the terms on which he will deal," citing Colgate.[40] But the Colgate doctrine has no applicability to "[a] joint effort to fix prices."[41] NTSP's right to refuse to deal

---

[37] Id. at 292.

[38] Id. at 293.

[39] 250 U.S. 300 (1919).

[40] St. Bernard Gen. Hosp., Inc. v. Hospital Serv. Ass'n of New Orleans, Inc., 712 F.2d 978, 986-87 (5th Cir. 1983).

[41] Id. at 987.

14

turns on whether there has been such a joint effort, a subject we consider below in Part VI.

V

NTSP assails the legal framework used by the FTC to determine whether NTSP's structure and activities amounted to an unlawful restraint of trade, notwithstanding the proffered procompetitive justifications. The FTC employed what it termed an "inherently suspect" analysis, citing its prior decision in Polygram Holding, Inc.[42] and the District of Columbia Circuit's opinion affirming the FTC.[43]

NTSP contends that the FTC was required to conduct a more in-depth rule-of-reason analysis, which NTSP asserts should entail defining a relevant market and finding anticompetitive effects before its conduct could be condemned. NTSP further asserts that the FTC "ignored" the procompetitive justifications it advanced and that the Commission did not permit NTSP to prove the procompetitive effects of its non-risk contracting practices.

As noted earlier, the FTC concluded that NTSP's "conduct could be characterized as per se unlawful under the antitrust laws, and thus subject to summary condemnation."[44] The FTC chose, however, to apply its "inherently

---

[42] 5 Trade Reg. Rep. (CCH) ¶ 15,453 (F.T.C. 2003).

[43] Polygram Holding, Inc. v. FTC, 416 F.3d 29 (D.C. Cir. 2005).

[44] N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032, at 103,460, slip op. at 3 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf; see also id. at 103,463, slip op. at 10 ("There is precedent for outright per se condemnation of conduct that parallels the conduct in issue here. . . . Although NTSP's activities could be characterized as per se illegal because they are closely analogous to conduct condemned per se in this and other industries, we will not apply that label here and now in this particular case.").

suspect" analysis, which it described as a "close neighbor[]" to a per se analysis.[45] It gave two reasons for pursuing that course. The first was that "the Supreme Court has urged caution in the application of the per se label to conduct in a professional setting," and "the Commission wants to encourage providers to engage in efficiency-enhancing collaborative activity."[46]

The Commission said that the beginning of its inquiry should be determining whether NTSP had engaged in "'behavior that past judicial experience and current economic learning have shown to warrant summary condemnation.'"[47] The Commission reasoned that "[a]t this [initial] stage, the focus of the inquiry is on the nature [of] the restraint rather than on the market effects in a particular case."[48] It concluded that "[a] defendant can avoid summary condemnation, however, if it can advance a legitimate justification for the practice."[49] The Commission further reasoned that "[t]he defendant need only articulate a legitimate justification, and is not obliged to prove the competitive benefits," explaining in a parenthetical: "[r]emember that the issue at this initial stage is simply whether the practice should be condemned summarily."[50] The FTC concluded that in its "inherently suspect" paradigm,

---

[45] Id at 103,460, slip op. at 3.

[46] Id. at 103,464, slip op. at 11 (emphasis in original).

[47] Id. at 103,464, slip op. at 12 (quoting Polygram Holding, Inc., 5 Trade Reg. Rep. (CCH) ¶ 15,453 (F.T.C. 2003)).

[48] Id.

[49] Id.

[50] Id. at 103,464, slip op. at 12-13.

"[t]he proffered justifications . . . must be both cognizable under the antitrust laws and at least facially plausible."[51]  And,

> "[a] justification is plausible if it cannot be rejected without extensive factual inquiry. . . .  Although the defendant need not produce detailed evidence at this stage, it must articulate the specific link between the challenged restraint and the purported justification to merit a more searching inquiry into whether the restraint may advance procompetitive goals, even though it facially appears of the type likely to suppress competition."[52]

In reviewing the FTC's decision, our task is to apply the principles articulated by the Supreme Court.  It has "analyzed most restraints under the so-called 'rule of reason,'" which "requires the factfinder to decide whether under all the circumstances of the case the restrictive practice imposes an unreasonable restraint on competition."[53]  The Court has recognized the costs and the shortcomings when an "elaborate inquiry into the reasonableness of a challenged business practice" is conducted.[54]  However, the "costs of judging business practices under the rule of reason . . . have been reduced by the recognition of per se rules."[55]  "Once experience with a particular kind of restraint enables the Court to predict with confidence that the rule of reason will condemn it, it has applied a conclusive presumption that the restraint is

---

[51] Id. at 103,464, slip op. at 13.

[52] Id. at 103,465, slip op. at 13 (quoting Polygram Holding, Inc. v. FTC, 416 F.3d 29, 31-32 (D.C. Cir. 2005)).

[53] Arizona v. Maricopa County Med. Soc., 457 U.S. 332, 343 (1982).

[54] Id.

[55] Id. at 343-44.

unreasonable."[56] Practices that are per se unlawful include "price fixing, division of markets, group boycotts, and tying arrangements."[57] The per se rules can result in erroneous conclusions in some cases, but "[f]or the sake of business certainty and litigation efficiency, we have tolerated the invalidation of some agreements that a fullblown inquiry might have proved to be reasonable."[58] Procompetitive justifications will not be considered if a practice, such as price-fixing, is a per se violation. "The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."[59]

The Supreme Court has recognized, however, that even when practices are not condemned by a per se rule, a fullblown rule-of-reason analysis is not always required.[60] An "abbreviated or 'quick-look' analysis under the rule of reason" is appropriate when an "observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets."[61] Stated another way, "quick-look analysis carries the day when the great likelihood of anticompetitive effects

---

[56] Id. at 344.

[57] Id. at 344 n.15 (citing N. Pac. R. Co. v. United States, 356 U.S. 1, 5 (1958)).

[58] Id. at 344.

[59] Id. at 351.

[60] See, e.g., Texaco, Inc. v. Dagher, 547 U.S. 1, 7 n.3 (2006) ("To be sure, we have applied the quick look doctrine to business activities that are so plainly anticompetitive that courts need undertake only a cursory examination before imposing antitrust liability.").

[61] Cal. Dental Ass'n v. FTC, 526 U.S. 756, 770 (1999).

can easily be ascertained."[62] The "inherently suspect" paradigm that the FTC employed in the present case is a "quick-look" rule-of-reason analysis.

But a "quick-look" examination is not a rigid template. It must be tailored to fit the circumstances presented in each case. The Supreme Court explained in California Dental Association that "[t]he truth is that our categories of analysis of anticompetitive effect are less fixed than terms like 'per se,' 'quick look,' and 'rule of reason' tend to make them appear."[63] The Court continued:

> We have recognized, for example, that "there is often no bright line separating per se from Rule of Reason analysis," since "considerable inquiry into market conditions" may be required before the application of any so-called "per se" condemnation is justified. "[W]hether the ultimate finding is the product of a presumption or actual market analysis, the essential inquiry remains the same—whether or not the challenged restraint enhances competition."[64]

The California Dental Association decision directs us to conduct "an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint":

> [T]here is generally no categorical line to be drawn between restraints that give rise to an intuitively obvious inference of anticompetitive effect and those that call for more detailed treatment. What is required, rather, is an enquiry meet for the case, looking to the circumstances, details, and logic of a restraint. The

---

[62] Id. (citing Law v. National Collegiate Athletic Ass'n, 134 F.3d 1010, 1020 (10th Cir. 1998), for the proposition that "quick-look analysis applies 'where a practice has obvious anticompetitive effects,'" and Chicago Prof'l Sports Ltd. P'ship v. National Basketball Ass'n, 961 F.2d 667, 674-76 (7th Cir. 1992), for "finding quick-look analysis adequate after assessing and rejecting logic of proffered procompetitive justifications").

[63] Id. at 779.

[64] Id. at 779-80 (internal citations omitted) (quoting Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of the Univ. of Okla., 468 U.S. 85, 104 & n.26 (1984)).

object is to see whether the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency of a restriction will follow from a quick (or at least quicker) look, in place of a more sedulous one.  And of course what we see may vary over time, if rule-of-reason analyses in case after case reach identical conclusions.  For now, at least, a less quick look was required for the initial assessment of the tendency of these professional advertising restrictions.  Because the Court of Appeals did not scrutinize the assumption of relative anticompetitive tendencies, we vacate the judgment and remand the case for a fuller consideration of the issue.[65]

The FTC formulated its "inherently suspect" analysis after the issuance of California Dental Association, and the Commission's articulation of the shifting burdens employed in its analysis appears, at least facially, to comport with the framework provided by the Supreme Court's precedent.[66]  Reviewing courts must be attentive, however, to the actual application of the burden-shifting.

In California Dental Association, the Supreme Court faulted the court of appeals for describing the anticompetitive effects of the conduct under scrutiny in a cursory and conclusory manner,[67] and for failing to "identif[y] the theoretical basis for the anticompetitive effects and [to] consider[] whether the effects actually are anticompetitive."[68]  The need to determine, as an initial point of departure, whether the practice at issue theoretically has anticompetitive effects

---

[65] Id. at 780-81.

[66] See also Polygram Holding, Inc. v. FTC, 416 F.3d 29, 35-36 (D.C. Cir. 2005).

[67] Cal. Dental Ass'n, 526 U.S. at 774 ("But these observations brush over the professional context and describe no anticompetitive effects.").

[68] Id. at 775 n.12.

is important, indeed paramount, because "quick-look analysis in effect requires" "shifting to a defendant the burden to show empirical evidence of procompetitive effects."[69]   The Court made clear that "before a theoretical claim of anticompetitive effects can justify shifting to a defendant the burden to show empirical evidence of procompetitive effects, . . . there must be some indication that the court making the decision has properly identified the theoretical basis for the anticompetitive effects and considered whether the effects actually are anticompetitive."[70]  The Supreme Court admonished that if "the circumstances of the restriction are somewhat complex, assumption alone will not do."[71]  The Court emphasized in California Dental Association that "the [Court of Appeals'] adversion to empirical evidence at the moment of this implicit burden shifting underscores the leniency of its enquiry into evidence of the restrictions' anticompetitive effects."[72]

In the case before us, the FTC did not rely on empirical evidence in determining whether there was an "obvious anticompetitive effect that triggers abbreviated analysis."[73]  It relied on the theoretical basis for the anticompetitive and procompetitive effects of NTSP's challenged practices and the similarity of those practices to conduct that would be a per se violation of the FTC Act.  To some extent, the Commission also relied on evidence of the impact of NTSP's

---

[69] Id.

[70] Id.

[71] Id.

[72] Id. at 776.

[73] Id. at 778.

conduct on some payors. The FTC concluded that "the determination of illegality here does not require an elaborate inquiry into effects in the market."[74]

We, like the FTC, do not decide whether NTSP's challenged practices constituted a per se violation, although we agree that some of NTSP's practices bear a very close resemblance to horizontal price-fixing, generally deemed a per se violation. Quick-look analysis rather than a more searching rule-of-reason inquiry is appropriate only when "the likelihood of anticompetitive effects is . . . obvious," meaning "when the great likelihood of anticompetitive effects can easily be ascertained," and "after assessing and rejecting [the] logic of proffered procompetitive justifications."[75] To justify a quick-look analysis, the burden remains on the challenger to demonstrate that the proffered procompetitive effect does not plausibly result in "a net procompetitive effect, or possibly no effect at all on competition."[76] If, after examining the competing claims of anti- and procompetitive effects, it remains plausible that the net effect is procompetitive or that there is no effect on competition,[77] then "[t]he obvious anticompetitive effect that triggers abbreviated analysis has not been shown."[78]

As will be considered in detail below, we conclude that the net anticompetitive effects of certain of NTSP's practices were obvious. The

[74] N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032, at 103,460, slip op. at 3 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf.

[75] Cal. Dental Ass'n, 526 U.S. at 770-71 (citing Law v. Nat'l Collegiate Athletic Ass'n, 134 F.3d 1010, 1020 (10th Cir. 1998); Chicago Prof'l Sports Ltd. P'ship v. Nat'l Basketball Ass'n, 961 F.2d 667, 674-76 (7th Cir. 1992)).

[76] Id. at 771.

[77] Id. at 771.

[78] Id. at 778.

procompetitive justifications do not plausibly result in a net procompetitive effect or in no effect at all on competition. Accordingly, a quick-look analysis was appropriate in this case.

## VI

The FTC's ultimate conclusion was that the "activities [of NTSP], taken as a whole, amount to horizontal price fixing which is unrelated to any procompetitive efficiencies."[79] In deciding "whether NTSP's conduct amounts to a restraint of trade," the Commission said that it would first "look at the factual evidence to determine whether the conduct amounts to price fixing, and is thus illegal absent a cognizable and plausible justification."[80] In Part A below we consider "the theoretical basis for the anticompetitive effects" of NTSP's conduct and whether "the effects actually are anticompetitive."[81] We consider in Part B whether NTSP's proffered justifications might plausibly be thought to have net procompetitive effects.

## A

The first challenged restraint the FTC examined was polls of participating physicians that NTSP conducted.[82] NTSP asked each physician what minimum rate or fee he or she would be willing to accept during the coming year. The FTC found as factual matters that NTSP then reported the mean, median, and mode of the responses to all affiliated physicians, and those physicians were aware that NTSP would determine a minimum fee for its negotiations with payors from

---

[79] 2005-2 Trade Cas. (CCH) at 103,460, slip op. at 3.

[80] Id. at 103,467, slip op. at 17.

[81] Cal. Dental Ass'n v. FTC, 526 U.S. 756, 775 n.12 (1999).

[82] 2005-2 Trade Cas. (CCH) at 103,467, slip op. at 18.

the poll responses.[83] NTSP also reminded its physicians of the prior poll's results in soliciting each physician to state the minimum fee he or she would accept during the upcoming year. The FTC reasonably concluded that the "physicians anticipated that any individual response would help to raise or lower the average fee for the group—an average that NTSP would then use in negotiating with payors."[84]

The written Physician Participation Agreement NTSP had with each physician obligated the physician to refrain from pursuing an offer from a payor if NTSP was in negotiations with that payor.[85] This either foreclosed or delayed negotiations between those payors and physicians who were willing to accept a fee lower than the minimum fee determined by NTSP and used in its negotiations with payors. If NTSP was successful in obtaining a contract with a payor, it is logical to conclude that the fees to which NTSP agreed would be higher than the minimum fees that many of its participating physicians were willing to accept and had indicated in their polling responses they were willing to accept. The FTC relied on an expert's conclusions that "the NTSP minimum reimbursement rates were higher than what some physicians were actually willing to accept, and that negotiation of a minimum price offer has the effect of raising the prices that 'low end' physicians would otherwise earn, without reducing the price that 'high end' physicians would receive" because the "high end" physicians could "opt out."[86] These conclusions are logical and are

---

[83] Id.

[84] Id.

[85] See id. at 103,468, slip op. at 20.

[86] Id. at 103,468, slip op. at 19.

supported by the record. If NTSP did not consummate a contract with a payor in its negotiations, then that payor's ability to bargain directly with physicians was delayed. Payors' patients in need of medical services did not have access to NTSP physicians while negotiations were ongoing, and accordingly, the number of competing physicians was reduced.

NTSP disputes the FTC's construction of the Participating Physician Agreements with physicians, contending that those contracts do not require physicians to await notice from NTSP that negotiations with a payor have ceased before a physician may negotiate directly with that payor. The contracts do not support this argument. Section 2 of the physician agreement deals with payor offers. It provides in subsection 2.1 that "NTSP shall have the right to receive all Payor Offers made to NTSP or Physician," and the physician is obligated to "promptly forward such Payor Offer to NTSP for further handling." There is an exception for offers that are to extend or renew an existing contract between the physician and the payor.[87] Otherwise, it is only if NTSP rejects a payor offer that a physician has "the right to pursue such Payor Offer on its own behalf."[88] The agreements have a "non-exclusivity" clause, but it reiterates that

---

[87] Subsection 2.1 provides in its entirety:

Receipt of Payor Offers. NTSP shall have the right to receive all Payor Offers made to NTSP or Physician, except for any Payor Offer made to Physician which is solely in replacement or renewal of a contract which exists between such Payor and Physician as of the date of March 1, 1998. If Physician receives a Payor Offer (other than a Payor Offer made to Physician which is solely in replacement or renewal of a contract which exists between such Payor and physician as of the date of March 1, 1998), Physician will promptly forward such Payor Offer to NTSP for further handling in accordance with the provisions of this Agreement.

[88] Subsection 2.6 provides:

physicians may not negotiate directly with payors concerning services covered by a payor offer or an existing NTSP agreement.[89]  The non-exclusivity clause recognizes that physicians may contract with other physician groups, but only "[s]ubject to Section 2" of the NTSP agreement.[90]

NTSP asserts that even if we agree with the FTC's construction of the physician agreements, there is no evidence that any physician actually refused to negotiate with a payor while NTSP negotiations with that payor were ongoing. The FTC found to the contrary, and there is evidence from payors that physicians declined to negotiate because they had designated NTSP as their bargaining agent.

---

> Payor Offers Rejected by NTSP.  If NTSP rejects any Payor Offer and advises the Participating Physicians in writing that it is permanently discontinuing negotiations or if the Participating Physicians who approved and who are deemed to have approved a Non Risk Payor Offer constitute less than 50% of all Participating Physicians, then NTSP shall have no further responsibilities with respect thereto and any Participating Physician shall have the right to pursue such Payor Offer on its own behalf.

A "Payor Offer" is defined as "an offer made by a Payor to NTSP or Participating Physician that requires NTSP or one or more Participating Physicians to provide covered services pursuant to a commercial or medicare health benefit plan."

[89] Subsection 8.1 provides:

> Non-Exclusivity.  Subject to the provisions of Section 2 above, Physician shall be free to (i) negotiate separate contracts directly with payors for services not covered by any Payor Offer or Payor Agreement and to provide on an individual basis any medical services not subject to a Payor Agreement to any Beneficiary and (ii) provide medical services of any type to any patient who is not covered under any Payor Agreement.  Subject to Section 2 above, Physician may contract with other independent practice associations, physician hospital organizations, preferred provider organizations and other managed care provider networks.

[90] See id.

NTSP points out that only 34 percent of its physicians responded to its polls. The FTC concluded, however, that the fact that poll results were disclosed to all NTSP physicians, regardless of whether they responded to the poll, encouraged physicians "to reject price offers below the minimum fees indicated."[91] It is not obvious that this is the case as to all physicians affiliated with NTSP. Physicians who had expressed an unwillingness to contract at fees below NTSP's minimum might not have been influenced by learning of NTSP's minimum negotiating fee. Those physicians may have rejected price offers below NTSP's minimum in any event. But it is obvious that the practice of reporting poll results encouraged other physicians to reject offers that equaled the fee they reported in the poll as the minimum they would have accepted if the offered fee was less than the minimum fee calculated by NTSP. Armed with knowledge from NTSP's polling, those physicians would also be encouraged to hold out for a fee equal to or even less than NTSP's minimum fee but greater than the fee they were willing to accept at the time they responded to the poll.

The FTC further found that "NTSP actively encouraged [physicians] to reject the offers" below the minimum fees indicated in the polls.[92] That finding is supported by the record and is evidence of concerted action to fix prices.

The record evidence supports the FTC's factual finding that NTSP "regularly informed payors that its physicians had established minimum fees for NTSP-payor agreements, identified the fee minimums, and stated that NTSP would not enter into or forward to any of its physicians payor offers that were

---

[91] 2005-2 Trade Cas. (CCH) at 103,468, slip op. at 20.

[92] Id.

below the minimums."[93]   There was evidence that after receiving this information, payors attempted to deal directly with individual physicians but were told by those physicians that they must negotiate with NTSP.  The logical tendency of this practice, coupled with the physicians' agreement to refrain from negotiating with payors, was at a minimum to delay direct negotiations between payors and physicians, including physicians willing to accept fees lower than the minimum used by NTSP.  This added significant transaction costs to offers below NTSP's minimum.  A payor wishing to achieve a contract below that minimum would have to submit its offer to NTSP, negotiate with NTSP, and wait until NTSP communicated to physicians that negotiations were unsuccessful, before being able to negotiate with physicians directly.  Accordingly, even though NTSP could not bind physicians to particular contracts, its practices interfered with payors seeking lower fees.  NTSP's practices also narrowed patients' choices of physicians.

The FTC additionally found, based on the record evidence, that although the Participating Physician Agreements require NTSP to deliver certain payor offers to physicians,[94] NTSP in fact "rejects and does not deliver any contract that falls below its minimum reimbursement schedule."[95]  This prevented or at least delayed offers less than NTSP's minimum fee from reaching physicians.

The agreements NTSP had with physicians further "contain[] provisions whereby 50 percent of NTSP's membership must approve the reimbursement

---

[93] Id.

[94] Section 2.2 of the Participating Physician Agreements covers "Offers to be Accepted or Rejected by Physicians," a category of payor offers defined separately from other payor offers.

[95] 2005-2 Trade Cas. (CCH) at 103,469, slip op. at 21.

proposal of a payor before an offer is 'messengered' by NTSP to the physicians for actual opt-in/out [on an individual basis] of the proposed contracts."[96]  This provision allows NTSP to counter payor rate proposals on direction from at least 50 percent of its physicians.  The FTC concluded that

> NTSP is able to exert collective bargaining power and hence fix prices because NTSP does not messenger contracts below its minimum reimbursement schedule.  Instead it rejects the contracts outright on behalf of its physicians and NTSP's collective bargaining leverage is thus exerted before its physicians even have a chance to opt in or out of a contract.[97]

Here again, it is obvious that when NTSP is successful in negotiating with a payor, the fees in those contracts would tend to be higher than fees many participating physicians otherwise would have been willing to accept, since a significant number of physicians had previously indicated in polling they would be willing to accept less than the mean, median, or mode on which NTSP's minimum negotiating fee was determined.

Another challenged practice is NTSP's use of powers of attorney from its physicians.  The FTC found that in negotiations with Aetna, NTSP sent Aetna a list of 180 physicians who had executed powers of attorney appointing NTSP as the bargaining agent for any direct contracting with Aetna.[98] Aetna officials testified that they understood this as a message that the physicians would not

---

[96] Id.

[97] Id.

[98] Id. at 103,469, slip op. at 22.

negotiate directly, and Aetna concluded there was no practical alternative other than to deal with NTSP.[99]

NTSP contends that the powers of attorney only authorized NTSP to act "in any lawful way." However, in obtaining the powers of attorney, NTSP advised physicians that it would pursue a contract "that meets or exceeds the fee schedule minimums set by the NTSP membership." NTSP did in fact negotiate with payors on behalf of physicians regarding the fees that would be paid.

The FTC further concluded that NTSP had engaged in concerted withdrawals and refusals to deal except on collective terms. The FTC pointed to NTSP's termination of contracts United Healthcare Services, Inc. had with 101 physicians when NTSP was dissatisfied with negotiations.[100] The ALJ's findings in this regard and the facts in the record reflect that United then attempted to negotiate directly with NTSP physicians, they refused, and United ultimately offered NTSP higher reimbursement rates.[101]

In another instance cited by the FTC,[102] the ALJ's findings and facts in the record reflect that NTSP had a contract with Cigna that applied to physicians who were specialists.[103] NTSP demanded that its primary care physicians be

---

[99] Id.

[100] Id. at 103,469-70, slip op. at 22.

[101] N. Tex. Specialty Physicians, 2004 WL 3142857, slip op. at 22-25, 27-29 (F.T.C. Nov. 15, 2004) (ALJ's Initial Decision), available at http://ftc.gov/os/adjpro/d9312/041116initialdecision.pdf; Transcript of trial before ALJ at 345-48, 443-44, 454-55, 459-60, N. Tex. Specialty Physicians, 2004 WL 3142857 (F.T.C. Nov. 15, 2004) (Docket No. 9312) [hereinafter Tr.].

[102] 2005-2 Trade Cas. (CCH) at 103,470, slip op. at 23.

[103] 2004 WL 3142857, slip op. at 32-33.

permitted to "participate" in this contract.[104] Cigna already had contracts with most of these primary care physicians at lower rates.[105] NTSP threatened contract termination if its demands were not met,[106] and to avoid losing the participation of NTSP's specialists, Cigna agreed to NTSP's demands.[107]

At several points in its briefing, NTSP stresses that the FTC and the ALJ found that NTSP did not receive higher rates than those that other physicians and physician groups were already receiving. The FTC addressed this fact, saying "[w]e agree that higher physician rates, by themselves, are of no antitrust significance," but the Commission concluded that "this case is about a concerted effort by NTSP's participating physicians to increase their bargaining power."[108] We agree that proof of higher fees for NTSP physicians is not necessary in this case. As the Supreme Court explained in FTC v. Indiana Federation of Dentists, if a practice "is likely enough to disrupt the proper functioning of the price-setting mechanism of the market . . . it may be condemned even absent proof that it resulted in higher prices."[109] In that case dentists had agreed not to send dental x-rays to their patients' insurance companies for use in benefits determinations. The Supreme Court held this was an unfair method of

---

[104] Id. at 35.

[105] Id. at 35; Tr. at 718-19, 733-34.

[106] 2004 WL 3142857, slip op. at 36.

[107] Id.; Tr. 749-51.

[108] N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032, at 103,477, slip op. at 36-37 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf.

[109] 476 U.S. 447, 461-62 (1986).

competition in violation of section 5 of the Federal Trade Commission Act.[110] NTSP's challenged practices erect barriers between payors and physicians who would otherwise be willing to negotiate directly with those payors. It also erects obstacles to price communications between payors and physicians. The Commission concluded, and we agree, that NTSP engaged in concerted action to increase its bargaining power. The fact that there is no evidence in the record that NTSP obtained higher prices for its physicians than other physicians received does not foreclose a determination that NTSP's practices had anticompetitive effects.

The other side of the equation, however, is the procompetitive effects, if any, that NTSP's challenged business practices generated. We turn to those.

B

After concluding that NTSP's challenged conduct had anticompetitive effects, the FTC proceeded to examine NTSP's justifications. Although the general thrust of NTSP's arguments regarding "spillover" benefits has some facial plausibility, closer examination of the underpinnings of the justification reveals significant gaps in logic.

---

[110] Id. at 448-49, 461-62 (explaining more fully that "[a] concerted and effective effort to withhold (or make more costly) information desired by consumers for the purpose of determining whether a particular purchase is cost justified is likely enough to disrupt the proper functioning of the price-setting mechanism of the market that it may be condemned even absent proof that it resulted in higher prices or, as here, the purchase of higher priced services, than would occur in its absence. [E]ven if . . . the costs of evaluating the information were far greater than the cost savings resulting from its use [] the Federation would still not be justified in deciding on behalf of its members' customers that they did not need the information: presumably, if that were the case, the discipline of the market would itself soon result in the insurers' abandoning their requests for x rays. The Federation is not entitled to pre-empt the working of the market by deciding for itself that its customers do not need that which they demand.").

The FTC first considered the polling of physicians. The Commission reasoned, and we agree, that NTSP's argument that its polls permitted it to determine when spillover efficiencies from risk contracts to non-risk contracts were likely to occur did not withstand scrutiny. Of the 34 percent of NTSP physicians responding to the poll, only 55 percent were physicians who participated in NTSP's risk contract. Accordingly, the mean, median, and mode that NTSP determined and used to negotiate with payors was based on minimum acceptable fees from non-risk as well as risk panel physicians. These polling results would not be a particularly effective tool to determine the fee that would attract a majority of NTSP's risk panel physicians, particularly since NTSP did not know which poll responses came from risk as distinguished from non-risk panel physicians. This undercuts a logical nexus to claimed efficiencies and thus the plausibility of the proffered procompetitive effects.

The Commission also recognized that it was not evident how physicians who enter only non-risk contracts could achieve spillover efficiencies from NTSP's risk contract, and NTSP did not offer an explanation. As the FTC correctly noted, "[t]his is a non-trivial point, because non-risk physicians make up half of NTSP's members."[111] This means that half of NTSP physicians had no experience in teamwork with NTSP physicians on the risk panel. Additionally, NTSP had only one risk contract, and it was a small part of NTSP's business. The FTC made further observations supported by the evidence:

> NTSP does not even explain why its risk panel physicians will have the incentive to apply the quality and cost control techniques they utilize on risk patients to any non-risk patients they may have.

---

[111] 2005-2 Trade Cas. (CCH) at 103,473, slip op. at 30.

> NTSP has not provided any financial incentive for them to do so, and it does nothing to promote compliance with whatever techniques have been learned under risk contracts. NTSP does not employ the processes it uses to monitor and control the quality and utilization of services provided under its risk contracts to patient care provided under non-risk contracts.[112]

NTSP argues that it did offer some empirical evidence but that the Commission "ignored" it. There is some evidence in the record of spillover effects from the risk contract to non-risk panels, and there is evidence that NTSP physicians perform as well or better than non-NTSP groups. For example, an NTSP expert opined that there is some reason to believe that "what NTSP learns in its risk contracting accrues to the benefit of payors even in the nonrisk setting" and that there are "palpable and real," "beneficial" effects from NTSP's business model. NTSP's expert pointed out that patient data created in a risk setting is available to physicians treating similar patients under a non-risk contract, "disease management and patient education programs" have benefits that spill over to treatment of patients under non-risk contracts, and NTSP's website allows patients and potential payors to see performance and quality data for NTSP and other Dallas or Fort Worth area physicians.

We assume that all of the foregoing is factually correct. But, as the FTC importantly noted, NTSP "does not address how [its] nebulous 'teamwork' efficiencies are dependent on its price-fixing activities."[113] NTSP has no theory as to how its proffered procompetitive effects, which we will assume are higher quality healthcare provided by teamwork and shared experiences over time,

---

[112] Id. (record citations omitted).

[113] Id. at 103,474 n.45, slip op. at 30 n.45.

result from or are in any way connected to (1) communicating the polling results regarding fees to all NTSP physicians, (2) encouraging NTSP physicians to reject payor offers below the minimum fees NTSP calculated from the polls, or (3) using collective bargaining power to demand higher fees for physicians who are already under contract with a payor.

We recognize that the Supreme Court has said that the "'public service aspect, and other features of the professions, may require that a particular practice, which could properly be viewed as a violation of the Sherman Act in another context, be treated differently.'"[114] But NTSP has not cogently articulated how "the quality of the professional service that [its] members provide is enhanced by the price restraint."[115]

NTSP offered three other "justifications" for its challenged conduct. The first is that it had "no legal obligation to participate in, messenger, or facilitate a payor's contract offer," and as "a collection of individuals" the group had the right to vote among themselves "not to involve" the group in a contract. NTSP argues that it did not have a significant market share and "that even a monopolist has a right to refuse to deal." This is re-argument of issues relating to an agreement and concerted action, which we have addressed earlier.

The second justification NTSP offers is that it "need[ed] to avoid expending scarce resources in analyzing, messengering, and participating in contracts of interest to relatively few of the physicians." We do not disagree that this is a

---

[114] Nat'l Soc'y of Prof'l Eng'rs v. United States, 435 U.S. 679, 687 (1978) (quoting Goldfarb v. Va. State Bar, 421 U.S. 773, 788-89 n.17 (1975)).

[115] Arizona v. Maricopa County Med. Soc'y, 457 U.S. 332, 349 (1982).

permissible goal, but this does not justify the challenged methods NTSP used to achieve that goal.

The third justification was "the avoidance of legally or medically risky situations" and that NTSP was "surely justified in refusing to sign payor contracts that present these problems." These are certainly permissible goals. But again, none of these concerns had any bearing on the methods NTSP used in an attempt to obtain higher fees than its physicians might otherwise have been offered.

One of NTSP's chief complaints is that it was not permitted to develop a fuller record, based on additional empirical evidence. However, it does not assert that the additional empirical evidence it desired to develop would have shown a nexus between better or market-priced medical care and the need for NTSP to engage in the specific activities that we conclude are anticompetitive, which include (1) the communication of the mean, median, and mode results from the polling regarding fees, in combination with (2) foreclosing or delaying direct negotiations between payors and physicians; (3) urging physicians to reject fee offers from payors; and (4) using collective bargaining power to demand higher fees for physicians who were already under contract at a lower fee.

In sum, based on the record in this case, we conclude that "the experience of the market has been so clear, or necessarily will be, that a confident conclusion about the principal tendency"[116] of NTSP's challenged practices follows from the "look" the FTC conducted in this case, even though that "look" was less than a fullblown market analysis. "[T]he inquiry mandated by the Rule of Reason is whether the challenged agreement is one that promotes competition

---

[116] Cal. Dental Ass'n v. FTC, 526 U.S. 756, 781 (1999).

or one that suppresses competition."[117] NTSP's proffered procompetitive effects do not meet the "might plausibly be thought to have a net procompetitive effect, or possibly no effect at all on competition" threshold.[118] The Commission's determination that NTSP's conduct, taken as a whole, amounted to horizontal price-fixing that is unrelated to procompetitive efficiencies is supported by the law and substantial evidence.

## VII

NTSP maintains that its right to due process was violated because it was denied discovery that would have proven the procompetitive effects of its conduct. NTSP subpoenaed the "flat file data" from six insurance company payors, each of which objected to providing the information. NTSP explains that "flat file data" would reflect "medical expenses paid for each patient and can be analyzed to compare different physicians' expense 'per unique patient seen' by procedure, by diagnostic code, and numerous other factors." NTSP contends that from this data, it could prove how its performance on non-risk contracts "compares to that of other physicians." After conducting a hearing, the ALJ quashed the subpoenas.

In reviewing the ALJ's decision, FTC reasoned:

> In the absence of a specific link between the challenged restraints and the purported justification, it would not have mattered if [NTSP] had been able to obtain further discovery and demonstrate that its physicians performed well. There is no antitrust exemption for more efficient, higher quality market participants, absent a demonstration that the challenged practices made an essential

---

[117] Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 691.

[118] See Cal. Dental Ass'n, 526 U.S. at 771.

contribution to these efficiencies. Evidence on the performance of NTSP physicians, standing alone, would not prove that nexus.[119]

NTSP contends that our review of this determination is de novo since NTSP is claiming a due process violation. Even assuming that is the correct standard of review, there was no due process violation. There is no logical nexus between better performance by NTSP physicians and NTSP's dissemination of polling results or its other challenged practices that we have discussed above.[120]

## VIII

Finally, NTSP challenges the breadth of the Commission's remedial order. Once the FTC has established a violation of the FTC Act, it "has wide discretion in determining the type of order that is necessary to cope with the unfair practices found."[121] The FTC's order should not be disturbed "unless the remedy selected has no reasonable relation to the unlawful practices found to exist."[122] We are persuaded, however, that the remedy is overly broad in one respect.

The remedial order provides in Part II.A:

---

[119] N. Tex. Specialty Physicians, 2005-2 Trade Cas. (CCH) ¶ 75,032, at 103,475, slip op. at 32-33 (F.T.C. 2005), available at http://ftc.gov/os/adjpro/d9312/051201opinion.pdf (citations omitted).

[120] See Nat'l Soc'y of Prof'l Eng'rs, 435 U.S. at 693-94 ("The Society nonetheless invokes the Rule of Reason, arguing that its restraint on price competition ultimately inures to the public benefit by preventing the production of inferior work and by insuring ethical behavior. As the preceding discussion of the Rule of Reason reveals, this Court has never accepted such an argument.").

[121] FTC v. Colgate-Palmolive Co., 380 U.S. 374, 392 (1965).

[122] Alterman Foods, Inc. v. FTC, 497 F.2d 993, 997 (5th Cir. 1974) (quotation marks omitted).

IT IS FURTHER ORDERED that Respondent, directly or indirectly, or through any corporate or other device, in connection with the provision of physician services . . . cease and desist from:

A.    Entering into, adhering to, participating in, maintaining, organizing, implementing, enforcing, or otherwise facilitating any combination, conspiracy, agreement, or understanding between or among any physicians with respect to their provision of physician services:

      1.    to negotiate on behalf of any physician with any payor;

      2.    to deal, refuse to deal, or threaten to refuse to deal with any payor;

      3.    regarding any term, condition, or requirement upon which any physician deals, or is willing to deal, with any payor, including, but not limited to, price terms; or

      4.    not to deal individually with any payor, or not to deal with any payor through any arrangement other than Respondent . . . .

While we do not accept many of NTSP's arguments regarding this section of the order, NTSP's contention that subsection (A)(2) is overly broad and internally inconsistent has merit. The ALJ refused to include such a provision, recognizing that it "could have the effect of compelling Respondent to messenger contracts or become a party to contracts sent to it by payors, regardless of potential risks to Respondent, its member physicians, and its patients."[123] This observation is valid. It is also difficult to see how NTSP can both deal and refuse to deal with any payor.

NTSP also challenges Paragraph IV of the order, which requires cancellation of all existing non-risk contracts with payors. These cancellations

---

[123] N. Tex. Specialty Physicians, 2004 WL 3142857, slip op. at 89 (F.T.C. Nov. 15, 2004) (ALJ's Initial Decision), available at http://ftc.gov/os/adjpro/d9312/041116initialdecision.pdf.

are to take place at the earlier of receipt of a written request from a payor to terminate or the earliest termination or renewal date, even though payors may elect to continue the contracts for up to one year. This latter provision eliminates NTSP's concern that health care delivery will be interrupted.

NTSP asserts that payors should be permitted to decide if they want to terminate their contracts. However, the FTC reasonably concluded that if the contract termination provisions were voluntary, payors might be unwilling to terminate, fearing reprisal.

NTSP also argues that its freedom of speech is being violated because it is limited in the information it can provide to payors and employers. In the commercial context, speech concerning unlawful activity is not protected.[124] In this case, NTSP's speech is limited only to the extent that it may not further illegal horizontal price-fixing conspiracies. The FTC's order does not unreasonably limit any protected speech by NTSP.

Finally, NTSP claims that the order is impermissibly vague. NTSP asserts that it cannot determine whether all individual components of its activity, such as polling and the Physician Participation Agreement, are prohibited permanently, or might properly be used in the future. We view such claims with skepticism.[125] As the Supreme Court stated, the FTC "must be allowed effectively to close all roads to the prohibited goal" of combinations that unreasonably restrain trade.[126] The FTC need not describe every combination

---

[124] See Greater New Orleans Broad. Ass'n, Inc. v. United States, 527 U.S. 173, 183 (1999).

[125] See Alterman Foods, 497 F.2d at 1001-02.

[126] See FTC v. Ruberoid Co., 343 U.S. 470, 473 (1952).

of circumstances and behaviors that may or may not create a violation.  The FTC's order is not unreasonably vague or overly broad.

*         *         *

For the reasons stated above, we GRANT petitioner's request for review and REMAND this proceeding to the FTC for modification of subsection II.A.2 of the remedial order in a manner consistent with this opinion.